No. 15-1061

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

_____

PAUL A. LEWIS,

Appellant,

v.

SLOAN D. GIBSON,

Appellee,

_____

Appeal from The United States District Court

For the Middle District of North Carolina

_____

BRIEF OF APPELLANT PAUL A. LEWIS

Mary March Exum

THE EXUM LAW OFFICE

30 Grandview Court

Asheville, NC 28806

Phone: (828) 505-6555

Attorney for Appellant

PAUL A. LEWIS

# Table of Contents

Page(s)

CORPORATE DISCLOSURE

Table of Contents .................................................................................. i

Table of Authorities............................................................................. iii

STATEMENT OF JURISDICTION ...................................................... 1

QUESTIONS PRESENTED FOR REVIEW ......................................... 1

STATEMENT OF THE CASE ............................................................... 1

STATEMENT OF FACTS..................................................................... 2

SUMMARY OF THE ARGUMENT ................................................... 15

ARGUMENT ...................................................................................... 16

Standard of Review ........................................................................... 16

    A.   MR. LEWIS PRESENTED EVIDENCE THAT HE WAS
         DISABLED, DEFENDANT KNEW IT, HE WAS A QUALIFIED
         EMPLOYEE WITH ACCOMMODATION, AND DEFENDANT
         ENGAGED IN DISABILITY DISCRIMINATION WHEN IT
         DENIED HIS REASONABLE REQUEST FOR
         ACCOMMODATION ...................................................................... 18

        1.  Mr. Lewis is disabled ........................................................ 19

        2.  Defendant Knew Of Mr. Lewis' Disability ........................ 19

        3.  Mr. Lewis Could Perform The Essential Functions Of His Job With
           Reasonable Accommodation................................................ 20

        4.  Defendant Refused To Make Reasonable Accommodations ............. 27

i

B.  MR. LEWIS PRESENTED EVIDENCE THAT HE WAS ENGAGED
IN A PROTECTED ACTIVITY AND THERE WAS A CAUSAL
CONNECTION BETWEEN THE PROTECTED ACTIVITY AND
HIS DISCHARGE BY DEFENDANT .....................................................28

CONCLUSION ........................................................................................34

CERTIFICATE OF COMPLIANCE ....................................................36

CERTIFICATE OF SERVICE..............................................................37

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Arizona*,
    2007 U.S. Dist. LEXIS 699 (D. Ariz 2007) ...................................................23

*Anderson v. Liberty Lobby, Inc.*,
    447 U.S. 242 (1986) ...................................................17

*Barth v. Gelb*,
    2 F.3d 1180 (C.A.D.C. 1993) ...................................................22

*Bell v. Shinseki*,
    584 Fed. Appx. 42 (4th Cir 1914) ...................................................34

*Bratten v. SSI Services, Inc.*,
    185 F.3d 625 (6th Cir. 1999) ...................................................23

*Calero-Cerezo v. U.S. Department of Justice*,
    355 F.3d 6, 26 (1st Cir. 2004) ...................................................29

*Campbell v. Hewitt, Coleman & Associate, Inc.*,
    21 F.3d 52 (4th Cir. 1994) ...................................................17

*Carozzo v. Howard Cnty, Md.*,
    847 F. Supp. 365 (D. Md. 1994) D. Md. 1994, *aff'd* 45 F.3d 425 (4th Cir. 1995)...................................................23

*Coleman v. Md. Court of Appeals*,
    626 F.3d 187 (4th Cir. 2010), *aff'd,* 132 S. Ct. 1327 (2012)...................................................29

*Crabill v. Charlotte Mecklenburg Bd. Of Ed.*,
    423 Fed. Appx. 314 (4th Cir 2011) ...................................................27

*Dean v. Pocono Medical Ctr.*,
    142 F.3d 138 (3d Cir. 1998)...................................................25

*E.E.O.C. v. Dollar General Corp.*,
    252 F. Supp. 2d 277 (M.D.N.C. 2003)...................................................23

*Enica v. Principi*,
    544 F.3d 328 (1st Cir. 2008) ........................................................29

*Fennell v. First Step Designs, Ltd.*,
    83 F.2d 526 (1st Cir. 1996) ........................................................29

*Halpern v. Wake Forest Univer. Health Sciences*,
    669 F.3d 454 (4th Cir. 2012) ........................................................17

*Lucas v. W.W. Granger, Inc.*,
    257 F.3d 1249 (11th Cir. 2001) ........................................................23

*Martinson v. Kinney Shoe Co.*,
    104 F.3d 683 (4th Cir. 1997) ........................................................23

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973) ........................................................29

*Moore v. Freeman*,
    355 F.3d 558 (6th Cir. 2004) ........................................................31

*Myers v. Hose*,
    50 F.3d 278 (4th Cir. 1995) ........................................................18, 20

*Newby v. Whitman*,
    340 F. Supp. 2d 637 (M.D.N.C. 2004) ........................................................29

*Overstreet v. Ky. Central Life Insurance Co.*,
    950 F.2d 931 (4th Cir. 1991) ........................................................16

*Price v. Thompson*,
    380 F.3d 209 (4th Cir. 2004) ........................................................29

*Reed v. LePage Bakeries, Inc.*,
    244 F.3d 254 (1st Cir. 2001) ........................................................22

*Rhoads v. Federal Deposit Insurance Corp.*,
    257 F.3d 373 (4th Cir. 2001), *cert. den.*, 535 U.S. 933, *reh'g den*. 536 U.S.
    952 (2002)…………………………………………………………18, 30, 31, 32

*Shoaf v. Kimberly Clark Corp.*,
    294 F. Supp. 2d 746 (M.D.N.C. 2003)................................................34

*Smith v. Strayer University Corp.*,
    2105 WL 153444 (4th Cir. 2015)................................................31

*Staley v. Gruenberg*,
    575 Fed. Appx. 153 (4th Cir. 2014) ................................................34

*Turner v. Hershey Chocolate USA*,
    440 F.3d 604 (3d Cir. 2006)................................................25

*US Airways, Inc. v. Barnett*,
    535 U.S. 391 (2002) ................................................20, 22, 28

*Wells v. BAE System Norfolk Ship Repair*,
    483 F. Supp. 497 (E.D. Va. 2007) 250 Fed. Appx. 552 (4th Cir 2007) ..........23

*Wimbish v. Donahue*,
    2012 U.S. DIST. LEXIS 33388 (M.D.N.C. 2012) ................................29

## STATUTES

28 U.S.C. § 1291 ................................................1
28 U.S.C. § 1331 ................................................1
29 U.S.C. § 794(d)................................................18
29 U.S.C. § 794 ................................................1, 18
42 U.S.C. § 12101 ................................................1, 19
42 U.S.C. § 12102(2)(A) ................................................19
42 U.S.C. § 12111(8)................................................20
42 U.S.C. § 12112(b)(5)(A) ................................................28
42 U.S.C. § 12203(a)................................................31
42 U.S.C. § 2000e-3 ................................................31

## RULES

Fed. R. Civ. P. 56(c) ................................................17

# STATEMENT OF JURISDICTION

These are claims brought pursuant to the Rehabilitation Act, 29 U.S.C. 794, and the Americans with Disabilities Act, 42 U.S.C. 12101, *et seq*. in the United States District Court for the Middle District of North Carolina. The District Court had jurisdiction pursuant to 28 U.S.C. 1331.

This is an appeal from a final judgment of the district court.  This Court has jurisdiction pursuant to 28 U.S.C. 1291.

## ISSUE PRESENTED FOR REVIEW

Whether the district court erred in allowing defendant's motion for summary judgment when there were facts before the court from which a jury could find all elements of plaintiff's claims of disability discrimination and retaliatory discharge.

## STATEMENT OF THE CASE

Paul A. Lewis, the plaintiff-appellant in this case, (hereinafter "Mr. Lewis"), was fired from his employment with the Durham Veterans Administration Medical Center, on August 12, 2011.  On September 12, 2011, he filed an appeal to the Merit Systems Protection Board, (hereinafter "MSPB").  (JA152-59).  On September 19, 2011, Mr. Lewis filed a formal complaint with the Equal Employment Opportunity Commission asserting disability discrimination.  (JA116, 136).  On March 31, 2012, the MSPB affirmed the Durham VMAC's discharge of Mr. Lewis.  (JA160).  On June 20, 2012, Mr. Lewis appealed the decision to the

1

EEOC Office of Federal Operations, which affirmed the MSPB's decision on October 4, 2012. (JA212).

On November 5, 2012, Mr. Lewis filed a *pro se* complaint against the defendant in the United States District Court for the Middle District of North Carolina, alleging disability discrimination and retaliatory discharge, in violation of the Americans with Disabilities Act and the Rehabilitation Act. (JA8). Both parties moved for summary judgment. (JA29, 535). No hearing was held on either motion. On December 15, 2014, the trial court issued a Memorandum Opinion and Order allowing defendant's motion and denying Mr. Lewis' motion. (JA836). Mr. Lewis filed Notice of Appeal on January 14, 2015.

## STATEMENT OF FACTS

Mr. Lewis began working for the Department of Veteran Affairs Medical Center in Durham, North Carolina, (hereinafter "defendant" or "the VA" or the "VAMC") in October of 2003. Beginning as a career intern, he shadowed the Chief of Human Resources for two years when he was promoted from GS-5 to GS-7 and hired as a Human Resources Specialist. (JA68-71). Mr. Lewis received positive evaluations, annual raises and promotions. In August, 2009, he was promoted from GS-9 to full performance at the GS-11 level. (JA 69-70). His duties as a human resources specialist varied, and included staffing and recruiting,

2

advertising, reviewing applications, qualifying applicants, giving technical advice and assistance, and customer service.  (JA73-74).

Mr. Lewis has suffered from learning disabilities all of his life, including dyslexia, attention deficit disorder, (hereinafter "ADD"), attention deficit hyperactivity disorder, (hereinafter "ADHD"), and problems with concentration. (JA97-98; 590).   Though he was not medically evaluated until he went to college, Mr. Lewis had received educational accommodation since kindergarten. (JA 98, 99, 590).  Despite his learning disabilities, Mr. Lewis, with accommodation, obtained a B.A. in Sociology from the University of Maryland Eastern Shores, a Master's degree in Divinity from Duke University, and two Master's degrees in Public Administration and Information Science from N.C. Central University. At the time of his deposition, on March 4, 2014, Mr. Lewis had taken two semesters toward a PhD in counseling and ministry.  (JA64-67).

With his learning disabilities, and accommodation by his supervisors, Mr. Lewis was successful at his work with the VA from the beginning of his employment.

Ms. Odessa Wright, (hereinafter "Ms. Wright"), was Mr. Lewis' supervisor from 2003 until January of 2010.  (JA 78-79, 137).  She took extra time to assist him with his paperwork.  (JA137).  In 2007, Mr. Lewis informed Ms. Wright of his learning disabilities.  (JA82).  He told her he had problems managing his workload

and he needed assistance. (JA630). Ms. Wright told him that she did not believe he had disabilities and that he should get some supporting medical documentation. (JA99, 630). Mr. Lewis was unable to obtain records from college, because of the lapse of time. (JA99; 630). Mr. Lewis testified that Ms. Wright "was wonderful. . . . She was aware I had some medical conditions, so she kind of worked to kind of help me with some of those things." (JA79).

Following Ms. Wright's advice, in December, 2008 and October, 2009, Mr. Lewis was given a neuropsychological evaluation to support his need for accommodation in taking the LSAT. (JA99-100). This evaluation revealed that he suffers from ADD, ADHD, and learning disabilities in reading, math, and writing where he performed "significantly below his aptitude level" and had "slowed processing" abilities. (JA567-71). The evaluation noted: "Mr. Lewis has a long history of academic problems that began in elementary school. He struggled in college and graduate school, but was able to complete his degrees with informal accommodations." (JA571). The neuropsychologist recommended giving Mr. Lewis more time in taking the test. (JA571).

In 2009, Zetta Ferguson, (hereinafter "Ms. Ferguson"), became the Chief of Human Resources Management at the VA. Mr. Lewis met with her and Ms. Wright to discuss his medical disabilities and the difficulty he was having with his workload and with processing information. He requested assistance to manage it.

(JA631).  Ms. Ferguson requested medical documentation (JA82) and Mr. Lewis submitted the neuropsychological evaluation he had obtained.  (JA94-95, 609, 631-32).  Ms. Ferguson worked with him and gave him additional time to complete assignments.  (JA631-32).  Mr. Lewis testified that Ms. Ferguson "would come to my desk and she would look at my assignments to see if I actually [sic] were doing them right.  And she did that type of thing."  (JA631).  During this time, Mr. Lewis continued to perform well at his job.  In August of 2009 he was promoted to GS-11.  (JA632-33).

In 2010, several important changes began taking place at Mr. Lewis' employment.  First, for much of 2010, Mr. Lewis' assistant, Ava Tinch, was out on leave or reassignment. As a result, Mr. Lewis' task load increased as he was required to take on the work Ms. Tinch had performed, in addition to his own work.  Mr. Lewis described Ms. Tinch's duties:  "[H]er job primarily was to recruit the staff and recruitment for . . . wage grade jobs.  She did all the security checks and in terms of a PIV, OIG, HIPAA.  She also did some of the administrative stuff and the physicals for all the employees."  He further testified that she had control over a system called e-QIP.  Mr. Lewis did not have access to e-QIP or PIV. (JA625-26).  Ms. Tinch had also left a backlog of work, creating additional pressure on Mr. Lewis. (JA 627).  The Human Resources department had a staffing

shortage.  According to Mr. Lewis, the section was 19 people short (JA 90-92), and he was doing the work of three people.  (JA90-92).

Second, in April of 2010, Christina Leach (hereinafter "Ms. Leach") formerly a human resources specialist co-worker of Mr. Lewis, was promoted to become his direct supervisor.  (JA79, 83, 38).  She met with Mr. Lewis in May of 2010 to discuss her expectations of him and the performance standards of his position.  During this meeting, Mr. Lewis informed Ms. Leach of his disabilities.  (JA82, 400).

Third, on or around July 30, 2010, Willette Yarborough (hereinafter "Ms. Yarborough") became the Acting Chief of Human Resources, replacing Ms. Ferguson.  She and Mr. Lewis engaged in a dispute over a staffing email that required a response and which Mr. Lewis had not received, as he was having difficulties receiving emails. (JA586)  Mr. Lewis' name was getting mixed up with another person at another VA department with the same name and their emails were getting crossed. (JA653)  In addition, most of Mr. Lewis' emails automatically went into an archives file.  Although Mr. Lewis reported these problems repeatedly, his computer problems were never resolved.  (JA564).  Mr. Lewis informed his supervisors, including Ms. Yarborough and Mr. Freeman about his email problems and was told "[t]he only person that actually had called in about your computer problems had been you . . . there's nothing been done on your

computer based on our records since 2007." Mr. Lewis was surprised to learn that there was no record of any work order to fix his computer. (JA655). Dierdre McCray, a co-worker, testified that Mr. Lewis had complained about computer problems to her. (JA674).

All these issues negatively affected Mr. Lewis' ability to get work done. (JA655). Nevertheless, during this conversation, Ms. Yarborough told him she was going to "write him up" if he did not turn in the requisite forms by 3pm that day. (JA 40, 588).

One week later, on August 6, 2010, Ms. Yarborough became the Interim Chief of Human Resources. (JA119). On that day she came to Mr. Lewis' desk and told him, "I want to change your tour of duty." (JA119-20). Mr. Lewis' tour of duty had been approved because his mother was sick (JA81), and he had specifically requested to stay in Durham to be near her to help care for her. Mr. Lewis' mother was hospitalized for 18 months from November 2009 through March of 2011, prior to her death in 2012. Mr. Lewis told Ms. Yarborough that he did not want to change it. Ms. Yarborough told him, "If you don't do this, I'm going to write you up." This conversation took place in front of two of Mr. Lewis' co-workers, Richard Grant and Michael Walton. (JA 94, 119-120, 588).

The following Monday, August 9, 2010, Ms. Leach put Mr. Lewis on a "Performance Improvement Plan" (hereinafter "PIP")(JA120, 262-65, 272). On

August 15, 2010 Mr. Lewis met with Ms. Leach and Ms. Yarborough.  For the first time, Mr. Lewis was informed that his performance had been "unsuccessful" between May 28, 2010 and August 15, 2010.  Mr. Lewis responded that:  (1) that his mother was in critical condition in the hospital; (2) he had a medical disability that was on file; (3) he had been having chronic computer issues; (4) his assistant had been detailed; and (5) he had picked up the work of two other people and no longer had an assistant.  (JA588; 633).

Mr. Lewis' new supervisors offered no assistance. (JA634).  Ms. Yarborough told Mr. Lewis that she did not believe anything was wrong with him, that she did not know what to do with the psychological documentation and that she "wanted it off her desk."  (JA83, 95).   Rather than review it, Ms. Yarborough returned the documentation to Mr. Lewis, did not read "every page of" it (JA796), and would not accept that anything was wrong.  (JA83, 95).  Mr. Lewis asked Ms. Leach and Ms. Yarborough if he could rebut or appeal the PIP.  Both advised Mr. Lewis that he could not do that. (JA87, 588; 624-25).

During Mr. Lewis' improvement plan, Ms. Leach assisted him on an individual basis, meeting with him once a week for four months and helping him to prioritize his workload.  (JA634).  As a result, in December, 2010, Mr. Lewis received a "fully successful" rating for the three essential elements of his job. (JA267).

In 2011, more changes further compromised Mr. Lewis' ability to successfully perform his work. In January 2011, Mr. Lewis' co-worker, Hilda Cobbs, left the VAMC, leaving Mr. Lewis with a portion of her work, in addition to his own, and that of Ava Tinch. (JA90, 625, 628, 674). Mr. Lewis testified, "both of these people left a significant amount of work to be done. I was expected to do my work and their work at the same level. I couldn't do it." (JA94; 628). Also in January, Mr. Jerry Freeman, (hereinafter "Mr. Freeman") became Chief of Human Resources, taking over this position from Ms. Yarborough.

On April 1, 2011, Human Resources switched to a new computer system, USA Staffing, which became mandatory for recruitment by Mr. Lewis and his co-workers. Mr. Lewis stated that it was very new and there were no experts in how to use it. (JA628). Mr. Lewis and his co-workers Diedre McCray and Lorraine Berry were having trouble learning this new system. They were not turning around their work assignments in a timely fashion and were receiving complaints. (JA132-33; 625, 628-29, 677, 706-07, 709-10). HR had staffing shortages, was overloaded with work, and "we were always having little problems being behind in our work." (JA709-10).

In early 2011, Ms. Wright became the Equal Employment Opportunity Manager, and she functioned as a staffing supervisor at the VA. (JA79). In April and May, 2011 Mr. Lewis had several conversations with Ms. Wright about filing

an EEO complaint. (JA138). Mediation was set up between Mr. Lewis and the

VAMC, but the VA ultimately refused to participate. (JA 109-110). In April,

2011 Mr. Freeman first became aware of Mr. Lewis' disabilities. (JA245).

On May 24, 2011, Mr. Lewis made a formal, written request for reasonable

accommodation for his learning disabilities, submitting his 2008-2009 evaluation

as support. (JA581). He stated that he had "been screamed at, cursed at, and made

to feel stupid because I was unable to comprehend at the same level as everyone

else." He requested (1) a change in performance standards; (2) a modified

workload; and (3) an assistant. (JA581). Mr. Lewis testified that he filed for

reasonable accommodation because he was falling behind.

> I was still having problems managing the workload in addition to all
> the things that were going on the office. I didn't have an assistant. I
> also had problems in reference to taking on the additional workload.

> And I felt that having the reasonable accommodations would allow
> me to be able to continue doing my job and also have the assistance I
> needed and I could work – I would be able to work, to do the job the
> best to my ability. (JA635).

After reviewing Mr. Lewis' request, Ms. Wright asked for more medical

documentation. Mr. Lewis said his doctor had informed him that his evaluation

was valid for 5 years. (JA95).

On May 24, 2011, Mr. Freeman called Mr. Lewis into his office. When Mr.

Lewis arrived, Mr. Freeman screamed and hollered at him and told him to "close

the fucking door." (JA113).

On June 3, 2011, Mr. Lewis contacted the VA's Office of Resolution Management in Washington, D.C.. (JA110-11). On June 6, he complained informally and on June 21 and 22 he had a telephone consultation with EEO counselor Jennifer Magee, (hereinafter "Ms. Magee"). On June 24, Ms. Carol Moulton, Regional EEO officer, notified Richard Gigliotti, the Director of the VA, (hereinafter "Mr. Gigliotti") that Mr. Lewis had filed an informal complaint with EEOC. (JA140).

That same day, Mr. Lewis received a Notice of Proposed Removal from Mr. Freeman indicating that Mr. Lewis was going to be terminated from his job. (JA127; 270-77). Mr. Lewis was surprised as he had not received any oral or written warnings with regard to his performance since he successfully completed his PIP in the fall of 2010. (JA 656). Mr. Freeman listed ten different "charges" against Mr. Lewis and gave Mr. Lewis until July 21, 2011 to respond. (JA232-40). Most of the charges related to matters in April and May of 2011. (JA270-77; 764). Because Human Resources had removed Mr. Lewis' computer access, he was unable to access his emails and supporting documentation between July 5 and July 26, 2011, causing him to miss Mr. Freeman's deadline for responding to the "charges". (JA612-13).

Until he received the Notice of Proposed Removal from Mr. Freeman, Mr. Lewis had no knowledge that he had not been successfully performing his job.

(JA108).  He had received no prior warning, oral or written.  He testified:  "Only after I filed the EEOC complaint did everything begin to escalate."  (JA108-09, 128).

Most of the charges involved alleged mistakes made by Mr. Lewis during the end of April and May of 2011, the time that corresponded with the implementation of the new USA Staffing program.  (JA351-53, 270-77, 764).  Mr. Lewis was not the only employee having difficulties completing his work in 2011.  Dierdre McCray testified that "[m]ost people were behind related to USA Staffing."  (JA671).  Lorraine Berry testified that when she worked with Mr. Lewis he seemed to get his job done in a timely fashion, and that she always saw him at his desk working.  (JA712).

In an August 3, 2011 letter, Mr. Gigliotti notified Mr. Lewis that he was being terminated effective August 12, 2011.  The letter states that Mr. Lewis had not provided a response to the "charges" in the Notice of Proposed Removal.  (JA107).  Before sending this letter, Mr. Gigliotti had not met with Mr. Lewis, (JA735) because "the timeliness was missed in the letter."  (JA735-37).

In July and early August, 2011, Mr. Lewis was engaged in the process of obtaining a new neuropsychological evaluation.  (JA104-06).  He emailed Ms. Wright on August 4, advising that this process was underway and that one of his appointments had been rescheduled from August 3 to August 10.  (JA138).

Notwithstanding, on August 5, 2011, the VAMC denied Mr. Lewis' request for reasonable accommodation. (JA96-97, 103, 107, 128, 135-38). Ms. Wright told Mr. Lewis that she would reopen his file regarding reasonable accommodation after he submitted additional documentation. (JA138). Mr. Gigliotti sustained Mr. Lewis' removal from the VA because, after meeting with Mr. Lewis on August 25, 2011, he did not "feel that there was enough evidence provided to counter those three elements that were identified in the proposal of removal report." (JA745). He made the decision without looking at Mr. Lewis' additional medical evaluation. (JA96-97, 128).

Mr. Gigliotti was not aware that Mr. Lewis had applied for reasonable accommodation until sometime "during the proposed removal period." Yet Ms. Wright kept him informed of the Mr. Lewis' EEOC complaint submitted to the Office of Resolution Management. (JA744).

Mr. Gigliotti did not discuss with Mr. Freeman whether the reasonable accommodation should have been granted. His recollection was that Mr. Lewis was asking for "a personnel assistant to help him, was what I remember." (JA741). When shown a copy of Mr. Lewis' request for reasonable accommodation, Mr. Gigliotti testified, "Oh, right. Yeah, the other two was change performance standards and modify workload. Right. I wasn't made aware of it." (JA742). Mr.

Gigliotti was not aware that there was medical documentation to support Mr.
Lewis' request.  (JA742).

On August 8, 2011, Mr. Lewis wrote Mr. Gigliotti, responding point by
point to each of the ten "charges".  He explained the circumstances that underlay
each one, requested to appeal his proposed removal and requested to meet with Mr.
Gigliotti.  (JA586-90).  In this letter, Mr. Lewis explained, point by point, what had
happened with regard to the "charges".  For example, with regard to charges 1, 4
and 7, these were related to his ability to access and retrieve his emails.  Charge 2
related to a matter where an applicant purposefully gave untrue information, and
the like.  (JA586-90).  He explained that his computer access had been shut down
on June 24, 2011 and not restored until July 26, 2011 and that the documentation
he needed to respond had not been available to him.  Mr. Lewis attached copies of
his psychological documentation from July and August of 2011 that diagnosed his
learning disabilities.  (JA586-90).  Mr. Lewis stated:  "The point I am making is
perhaps if I had the accommodation, my performance would have been different."
(JA590).

Mr. Gigliotti did not meet with Mr. Lewis until August 25, 2011. (JA222).
At that meeting, "we did not really address the customer service complaints."
(JA739).  Neither did he discuss Mr. Lewis' request for reasonable
accommodation, or its denial, (JA756), even though he could have altered that

decision. (JA757). Mr. Gigliotti saw no "causal effect" between the psychological documentation and the reasonable accommodation requests Mr. Lewis made. Although Mr. Gigliotti never looked at or read the medical documentation, (JA757) he approved the discharge because he saw no "causal effect" and "doubt[ed] the thoroughness of the doctor." (JA763).

On August 11, 2011 Mr. Freeman met with Mr. Lewis and told him "[w]e've been trying to get you for a long time and I'm going to terminate you." Mr. Lewis responded to this, saying, "what?" Mr. Freeman repeated this, saying "we've been trying to get you for a long time and I'm terminating you for job performance." (JA112).

On August 29th, 2011, Mr. Gigliotti notified Mr. Lewis by letter that he was upholding the removal decision. (JA222-23). After Mr. Lewis was terminated, the VA hired two new HR specialists, Vinette Collins and Montreal Jordan. (JA711). Mr. Gigliotti no longer works at the Durham VA. (JA107).

## SUMMARY OF THE ARGUMENT

Paul Lewis has succeeded in life as he had succeeded from 2003 until 2011 as a human relations specialist with the Durham, North Carolina VAMC. He succeeded because he was provided accommodation for his life-long learning disabilities. The VAMC informally provided accommodation until 2011. The VAMC experienced a temporary personnel shortage from 2010 through most of

2011, resulting in a substantial increase in Mr. Lewis' workload that exacerbated the effects of his disabilities. There were also changes in his supervisors. He formally requested an accommodation for his disabilities in May, 2011 and sought help from an EEO counselor. His new supervisors not only denied that request; when they learned he was consulting with the EEO counselor, they promptly proposed that he be discharged. The discharge decision was approved by the VAMC's medical director in late August, 2011.

Mr. Lewis, after exhausting administrative remedies, filed claims for disability discrimination and retaliatory discharge, which were heard in the district court on motions for summary judgment filed by both parties. Mr. Lewis presented sufficient evidence to permit a jury to find the existence of each element of his claims. Because this evidence created substantial issues of material fact, the district court erred in granting summary judgment for Defendant.

## ARGUMENT

THE DISTRICT COURT ERRED IN ALLOWING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT WHERE MR. LEWIS PRESENTED FACTS FROM WHICH A JURY COULD REASONABLY FIND ALL ELEMENTS OF HIS CLAIMS FOR DISABILITY DISCRIMINATION AND RETALIATORY DISCHARGE.

### Standard of Review

This Court reviews the grant or denial of summary judgment *de novo,*

*Overstreet v. Ky. Cent. Life Ins. Co.*, 950 F.2d 931, 938 (4th Cir. 1991), viewing all

the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmovant. *Halpern v. Wake Forest Univer. Health Sciences*, 669 F.3d 454, 460 (4th Cir. 2012). Summary judgment is appropriate only where the record shows "there is no genuine issue of any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 447 U.S. 242, 248 (1986).

Summary judgment should not be entered unless "the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the [non-moving] party cannot prevail under any circumstances." *Campbell v. Hewitt, Coleman & Assoc., Inc.,* 21 F.3d 52, 55 (4th Cir. 1994).

"Implicit in these basic rules is a consequence, frequently expressed as a maxim, that summary judgment is seldom appropriate in cases wherein particular states of mind are decisive as elements of claim or defense. [Citations omitted.] This reflects a general perception that whether as a matter of fact any particular state of mind exists can seldom be considered to be beyond reasonable dispute because this depends entirely upon the conflicting inferences to be drawn from evidence so likely to be circumstantial or, if direct, self-serving. *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979).

The substantial record supporting this appeal, much of it compiled while Mr. Lewis was *pro se*, is replete with controversy.  In this dispute, motive, inferences, and states of mind are at issue.

A.   MR. LEWIS PRESENTED EVIDENCE THAT HE WAS DISABLED, DEFENDANT KNEW IT, HE WAS A QUALIFIED EMPLOYEE WITH ACCOMMODATION, AND DEFENDANT ENGAGED IN DISABILITY DISCRIMINATION WHEN IT DENIED HIS REASONABLE REQUEST FOR ACCOMMODATION.

Mr. Lewis' *pro se* complaint alleges defendant discriminated against him by wrongly refusing to accommodate his disability in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. 794, which adopts the same standards for determining such claims as those contained within the Americans with Disabilities Act ("ADA").  29 U.S.C. 794(d).  *Myers v. Hose*, 50 F.3d 278 (4th Cir. 1995).  To succeed on this claim, Mr. Lewis must show: "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of [his] position . . .; and (4) that the [employer] refused to make such accommodations."  *Rhoads v. Fed. Deposit Ins. Corp.,* 257 F.3d 373, 387 n. 11. (4th Cir 2001), *cert. den.,*535 U.S. 933, *reh'g den.* 536 U.S. 952 (2002). There is evidence in the record from which a jury could find each of these elements.

5.  <u>Mr. Lewis is disabled</u>.

Uncontroverted psychological evaluations from December 2008-October 09 and from July-August 2011 establish that Mr. Lewis' suffers from learning disabilities.  (JA98-99, 567-71, 590, 593-97).  These evaluations concluded that Mr. Lewis' reading, math, and writing skills met the criteria for a learning disability in each area and that his history, current symptoms and performance on computerized tests were consistent with ADAD and ADD. (JA567-71, 593-97).  Mr. Lewis testified, "I'm dyslexic.  I have some learning disabilities.  I have problems with concentration."  (JA97).  Mr. Lewis' disabilities are qualified disabilities under the Americans with Disabilities Act (hereinafter "ADA").  A qualified disability is "a physical or mental impairment that substantially limits one or more of the major life activities of such individual," 42 U.S.C. 12102.  Learning and reading are major life activities.  42 U.S.C. 12102(2)(A) .

Because of these disabilities, Mr. Lewis may require more time than the average person to complete tasks and to learn new information and would benefit from more assistance and more regular progress assessments from his superiors. (JA593-97).

6.  <u>Defendant Knew Of Mr. Lewis' Disability</u>

Mr. Lewis discussed his disabilities with his supervisor, Ms. Wright,

in 2007, (JA82, 136) with Ms. Wright and Ms. Ferguson in 2009,  (JA82, 609), and

with Ms. Leach and Ms. Yarborough in 2010.  (JA82-83, 400, 588, 632-33).  In

2010, he gave a copy of the 2008 – 09 neuropsychological evaluation to Ms.

Ferguson who kept it in her desk.  Ms. Yarborough, who succeeded Ms. Ferguson,

upon finding the evaluation in Ms. Yarborough's desk, returned the evaluation to

Mr. Lewis, without reading "the whole thing," (Tr. 169-70), and telling Mr. Lewis

that "she didn't want it on her desk."  (JA 83, 95).

### 3. Mr. Lewis Could Perform The Essential Functions Of His Job With Reasonable Accommodation.

A qualified person with disabilities is one who can nevertheless perform the

essential functions of his job with reasonable accommodation.  *US Airways, Inc. v.*

*Barnett*, 535 U.S. 391 (2002); *Myers v. Hose*, 50 F.3d 278 (4th Cir. 1995); 42 USC

Sec. 12111(8).

Although Mr. Lewis has several advanced academic degrees, (JA64-67), his

disabilities have been life-long, and he has always needed and received disability

accommodation to succeed in his academic and other endeavors.  (JA97-100, 590).

At the VA, in 2009, Mr. Lewis successfully performed the functions of his

job because his supervisors accommodated his disabilities.  Mr. Lewis testified that

Ms. Ferguson gave him "adequate time" to complete his assignments and "worked

with me to kind of make sure I was doing assignments correctly . . . .  She was

willing to meet with me on her time . . . ."  (JA79-80, 632).   In 2009, Mr. Lewis

was promoted to "full performance level GS-11."  (JA60-70, 632-33).

In the fall of 2010, while Mr. Lewis was engaged in a Performance Improvement Plan, the VAMC continued to accommodate his disabilities.  He testified, "Christina Leach and I worked—met once a week every Monday for about an hour.  She told me to do these responsibilities in terms of my workload and that's what I would be responsible for that week."  Mr. Lewis was "fully successful" in completing his performance plan.  (JA267, 421, 633-34).

During 2010 and 2011, circumstances beyond Mr. Lewis' control detrimentally altered Mr. Lewis' workplace in a way that exacerbated the effects of his disabilities.  He had lost his assistant, Ava Tinch, which "had a great impact on my ability to complete my task."  (JA626-27).  He was assigned "a large portion" of the work of Hilda Cobbs, a GS-12 level worker. (JA625-28).   Other staff vacancies occurred in early 2011 that "weren't replaced until the latter portion of 2011."  (JA148; 666-69) .  Finally, he was having difficulty, as were others, with the VAMC's new computer program, "USA Staffing," which was installed in the spring of 2011.  (JA351-53, 628-30, 671-74).

By May, 2011, Mr. Lewis was falling behind in his work.  (JA635).  On May 24, 2011, believing he could continue to perform his job with some accommodation for his learning disabilities, Mr. Lewis filed a Request for Reasonable Accommodation for his learning disabilities.  (JA581-82).  The

21

Request recited that Mr. Lewis was being "expected to perform the duties of three employees" and that he had "been screamed, cursed at, and made to feel stupid because I was unable to comprehend at the same level as everyone else." Mr. Lewis requested a change in performance standards, modification of his workload and an assistant. (JA581-82).

Under the ADA, a request for a disability accommodation is reasonable if it "seems reasonable on its face, i.e., ordinarily or in the run of cases." *U.S. Airways, Inc. v. Barnett,* 535 U.S. 391, 401-02 (2002). An ADA plaintiff meets the burden of reasonableness if "at least on the face of things," the accommodation will be feasible for the employer. *Reed v. LePage Bakeries, Inc.* 244 F. 3d 254, 259 (1st Cir. 2001) (cited in *Barnett*). Under the Rehabilitation Act, to defeat a motion for summary judgment, a "plaintiff need only show he seeks a '*method of accommodation* that is reasonable in the run of cases.'" *U.S. Airways v. Barnett*, at 401-02, quoting *Barth v. Gelb*, 2 F.3d 1180, 1187 (C.A.D.C. 1993). Barnett also teaches that granting preferential treatment to the disabled employee is no bar to the reasonableness of an accommodation request since such preferences "are needed for those with disabilities to obtain the *same* workplace opportunities that those without disabilities automatically enjoy." *Barnett*, at 397.

Mr. Lewis' accommodation request meets these tests. On its face, his request for an adjustment in his workload and for an assistant are imminently

reasonable in light of his disabilities, which, combined with the extraordinary increase in his workload rendered him unable to keep up. That he once had an assistant supports the reasonableness of his request. The accommodations Mr. Lewis requested would essentially return him to the status he had when he was successfully performing the functions of his job. His request, considered with his work history at the VAMC, can easily be read as suggesting a reasonable "method of accommodation." A jury could reasonably find that with these accommodations Mr. Lewis could continue to perform those functions and was, therefore, a qualified employee because he had once done so. The trial court erred by concluding otherwise as a matter of law.

The trial court went to some length trying to explain its decision that Mr. Lewis' accommodation request was unreasonable, relying on cases that are inapposite to Mr. Lewis' request: *Lucas v. W.W. Granger, Inc.*, 257 F.3d 1249 (11th Cir. 2001); *Wells v. BAE Sys. Norfolk Ship Repair*, 483 F. Supp. 497 (E.D.Va. 2007, *aff'd* 250 Fed. Appx. 552 (4th Cir 2007); *Anderson v. Arizona*, 2007 U.S. Dist. Lexis 699 (D. Ariz 2007); *Carozzo v. Howard Cnty, Md.*, 847 F. Supp 365 (D. Md. 1994, *aff'd* 45 F.3d 425 (4th Cir. 1995); *E.E.O.C. v. Dollar General Corp.*, 252 F. Supp. 2d 277 (M.D.N.C. 2003); *Martinson v. Kinney Shoe Co.*, 104 F.3d 683 (4th Cir. 1997); *Bratten v. SSI Services, Inc.*, 185 F.3d 625 (6th Cir. 1999) .

Mr. Lewis did not request transforming his position (*Lucas*), eliminating

duties (*Wells*), reducing his workload beyond the minimum required (*Anderson*), changing the fundamental requirements of his job (*Carrozza*), hiring a full-time job coach (*Dollar General*), or necessarily hiring a permanent additional employee (*Martinson* and *Bratten*).  Indeed, as the trial court noted, plaintiff acknowledged in his brief below that "[a]though the agency has no obligation to change its performance standards, it does have an obligation to discuss with Plaintiff what accommodations he is seeking . . . ."  (JA860).

Mr. Lewis' request, properly understood, was for some help with his increased workload.  With a meaningful, good faith interaction with Mr. Lewis, his request might have been successfully resolved with nothing more than additional help from other co-employees, which the VAMC had previously provided.  His request for workload modification could have been met by simply allowing him somewhat more time to complete his assignments, a recommendation made in Mr. Lewis's psychological evaluations.  (JA567-71, 593-99).

The district court acknowledges the record support for this position, but then summarily concludes that such an accommodation would be "inherently unreasonable in that it would eliminate essential functions of the position."  (JA 861).  The district court seemed unduly concerned with certain performance "standards" adopted by the VAMC, such as responding to email "with 24 hours" and "initiating recruitment with 5 business days of authorization for the position."

(JA855).  It is, however, far from clear in the record below that these are "essential functions" of Mr. Lewis' job.

An ADA plaintiff does not have to show ability to perform all functions of the job, only the "essential functions." *Dean v. Pocono Med. Ctr.*, 142 F.3d 138, 146-49 (3d Cir. 1998).  Whether a particular job function is essential is "a factual determination that must be made on a case by case basis [based upon] *all* relevant evidence." *Id.* An employer's judgment as to what is essential is not "incontestable evidence . . . [of what] is an essential function of [employee's] job." *Id.* (reversing summary judgment for employer on this issue because there was genuine issue of fact on whether heavy lifting was an essential function of nurse's job)

In *Turner v. Hershey Chocolate USA*, 440 F.3d 604 (3d Cir. 2006), employees were expected to serve on three production lines.  Because the work required on one of these lines coupled with the plaintiff's disability made it difficult for her to serve on this line, the employer contended and the district court concluded she could not perform an essential function of the job, granting summary judgment for the employer.  The Court of Appeals reversed, holding the "issue should be decided by a jury." *Id*., at 613.   The Court relied on evidence that plaintiff's job description did not mention rotating among lines, little time was actually spent rotating, the collective bargaining agreement made no mention of it, and, in the past employees had not rotated.  *Id*., at 612-13.

Below, the district court appeared to give conclusive effect to VAMC's contentions about what were essential job functions, including the time standards. Yet, the time standards appear to be just that—goals and standards, not "essential functions." (JA 225-26)  Whatever the essential functions of his job were, Mr. Lewis, for almost his entire tenure at VAMC, performed them successfully.  As in *Dean* and *Turner*, the question of what were essential functions of Mr. Lewis' job should have been determined by the jury, not by the court as a matter of law.

For like reasons, the district court wrongly concluded that Mr. Lewis' request is facially unreasonable because it would inevitably "alter the fundamental functions of the HR Specialist Position . . . . [and] compromise the efficient operation of the Durham VAMC."

In making these conclusions about fundamentally altering the functions of Mr. Lewis' position, the trial court overlooked a key consideration that bears on the reasonableness of Mr. Lewis accommodation request.  The personnel shortage, which the VA was experiencing before and at the time of Mr. Lewis' accommodation request, was temporary and short-lived.  It was not permanent. Apparently the VA did not intend to leave the personnel vacancies unfulfilled because they continued to hire persons in 2011, after Mr. Lewis left, to fill the vacancies.  Hilda Cobb left sometime before 2011 but returned in late 2011; and in the latter half of 2011, the VA hired two specialists, Vinette Collins and Montreal

Jordan.  (JA711)  There were fewer staff members at the VA in early 2011 than there were later in the year after Mr. Lewis left.  (JA676).

This circumstance would make it reasonable for a jury to find that Mr. Lewis did not request that his position be fundamentally, or permanently, altered.  Rather, a jury could find that he was requesting reasonable assistance during the personnel shortage.  This could have come from existing employees and continued no longer than it took the VAMC to return to its full complement of personnel which it was apparently able to do not long after it discharged Mr. Lewis.

This case is thus distinguishable from cases like *Crabill v. Charlotte Mecklenburg Bd. Of Ed.*, 423 Fed. Appx. 314 (4th Cir 2011)(employee requesting "permanent light duty") relied on by the VAMC below.

4.  <u>Defendant Refused To Make Reasonable Accommodations.</u>

On May 24, 2011, Mr. Lewis presented to the VAMC a written "Request for Accommodation," attaching his 2008-09 medical evaluation.  Although Mr. Lewis advised that his evaluation was medically valid for 5 years, the VA requested more current medical documentation.  While Mr. Lewis was in the process of obtaining a new medical evaluation, on August 5, 2011, defendant denied Mr. Lewis' request.  After receiving Mr. Lewis' 2011 psychological evaluation, Mr. Gigliotti, "doubting the thoroughness of the doctor," never read it and confirmed the denial on August 29, 2011.  (JA 757-59,763).

Disability discrimination occurs when an employer fails to make reasonable accommodations to known disabilities of a qualified employee unless the employer "can demonstrate that the accommodation would impose *an undue hardship* on the operation of [its] business." *U.S. Airways v. Barnett*, 535 U.S., at 396; 42 USC 12112(b)(5)(A).  As stated above, there is evidence in the record to support Mr. Lewis' claim that the VAMC failed to make reasonable accommodations to his known disabilities and that he was a qualified employee.

Although the VA listed "undue hardship" as one of the reasons for its formal denial of Mr. Lewis' Request for Accommodation (JA584), it did not pursue this defense in its trial brief, (JA32-53); and the district court did not address it.

Based on the foregoing, a jury could reasonably find that by refusing to grant Mr. Lewis' reasonable request for disability accommodation, defendant engaged in disability discrimination.  This Court, should, therefore, reverse the district court's entry of summary judgment on Mr. Lewis' disability discrimination claim and remand this claim for trial on all issues.

> B.   MR. LEWIS PRESENTED EVIDENCE THAT HE WAS ENGAGED IN A PROTECTED ACTIVITY AND THERE WAS A CAUSAL CONNECTION BETWEEN THE PROTECTED ACTIVITY AND HIS DISCHARGE BY DEFENDANT.

To establish a prima facie case of retaliatory discharge, plaintiff must show: (1) the employee engaged in protected activity; (2) the employer took adverse

employment action against the employee; and (3) a causal connection existed between the protected activity and the adverse action.  *Coleman v. Md. Court of Appeals,* 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, 132 S. Ct. 1327 (2012); *Enica v. Principi,* 544 F.3d 328 (1st Cir. 2008)(claim against Dep't of Veterans Affairs); *Wimbish v. Donahue*, 2012 U.S. DIST. LEXIS 33388, at *35-36 (M.D.N.C. 2012)(retaliation claim analyzed in the same manner under Title VII and the Rehabilitation Act), *Newby v. Whitman*, 340 F. Supp. 2d 637 (M.D.N.C. 2004).

A plaintiff without direct evidence of retaliation, may proceed under the analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Once plaintiff establishes a prima facie case of retaliation, "the burden then shifts to the employer to establish a legitimate non-retaliatory reason for the action." *Id*., at 802-03; *see also Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004).  If the employer does so, the burden shifts back to the plaintiff to show that such reasons are pretextual.  *Id*.

This burden shifting is of more significance in a jury trial than in rulings on summary judgment.  "On summary judgment, the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a question for a fact finder as to pretext and discriminatory animus." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 26 (1st Cir.

2004)(quoting *Fennell v. First Step Designs, Ltd.*, 83 F.2d 526, 535-36 (1st Cir. 1996).

Where a retaliatory discharge plaintiff offers both direct proof in the form of adverse statements from the employer and indirect proof regarding the timing of the protected activity and the discharge, it is sufficient to survive a motion for summary judgment. *Rhoads v. F.D.I.C.*, 257 F.3d 373, 491-94 (4th Cir. 2001).

*Rhoads*, on its facts, is remarkably similar to Mr. Lewis' case. Rhoads was a financial analyst suffering from asthma, which was exacerbated by cigarette smoke. She contended her employer, despite repeated requests, failed to enforce its smoke-free environment policy. Rhoads consulted an attorney. At a meeting with her employer's representatives on August 18, 1993, her supervisor, Mr. Jones, upon learning of her consultation with a lawyer, "became upset and responded that I would regret that I had done so." *Id.,* at 392. Rhoads' lawyer continued to correspond with Rhoads' employer suggesting that it might be violating the ADA. Jones recommended that Rhoads be discharged. On September 13, 1993, two days after her attorney's last letter, Rhoads was discharged. The employer's stated reason for the discharge was Rhodes' excessive, unexcused absenteeism.

Rhoads sued her employer, claiming disability discrimination, discriminatory termination and retaliatory termination. The district court allowed summary judgment on all claims, concluding, under the burden shifting proof

scheme, that she had not rebutted the FDIC's legitimate reason—unexcused absenteeism--for her discharge.

Although affirming the district court's summary judgment on the discrimination claims, this Court reversed on the retaliation claim. The Court noted that Rhoads need not be disabled to pursue this claim. It held that Rhoads' direct evidence (Jones' statement regarding her consultation with a lawyer) and her indirect evidence (the timing of her attorney's letters in relation to the decision to fire her and Jones' involvement in that decision) "create a genuine issue of material fact with regard to Rhoads' retaliation claim." *Id.,* at 393-94. This Court determined that the district court's conclusion that no reasonable fact finder could find for Rhoads "was reached by improperly drawing inferences in favor of the FDIC." *Id.,* at 394.

So it is here:

 On May 24, 2011, Mr. Lewis applied for reasonable accommodation. On June 6, 2011, he contacted the Veteran Affairs Office of Resolution management in Washington, seeking EEO counseling. (JA 136) On June 21-22, 2011 he consulted by telephone with Jennifer Magee, an EEO counselor. (JA 162) All these events are "protected activities." *Smith v. Strayer University Corp.,* 2105 WL 153444 (4th Cir. 2015)(requesting accommodation protected activity); 42 U.S.C. 12203(a)(opposing act or practice made unlawful by ADA); 42 USC 2000e-3

(similar language in Title VII); *Moore v. Freeman*, 355 F.3d 558, 562-63 (6th Cir. 2004)(In FLSA case, informal complaint about salary is protected activity); *Rhoads* (consulting attorney).

On June 24th, 2011, Mr. Gigliotti, Director of the VAM, was notified of Mr. Lewis consultation with the EEO counselor. (JA 140). That same day Mr. Freeman determined to have Mr. Lewis discharged and proposed his removal. (JA424). On August 11, the day before Mr. Lewis was to be officially terminated, Freeman said to him, "We've been trying to get you for a long time and I'm terminating you for job performance." (JA112). Mr. Lewis had received no disciplinary warning concerning job performance from December of 2010, when he was rated "fully successful," until June 24, 2011.

As in *Rhoads*, there is here both direct (Freeman's statement) and indirect evidence (the timing of Mr. Freeman's proposed removal ultimately leading to Mr. Lewis' being removed). As in *Rhoads* there was here sufficient evidence for a jury to find that Mr. Lewis' discharge was retaliatory.

Further, there was evidence that Mr. Lewis' supervisors summarily, almost cursorily, considered his concerns, providing additional evidence that Mr. Lewis was discharged in retaliation for raising these concerns. When Ms. Yarborough discovered his 2008-2009 medical evaluation, she admitted not reading "the whole thing" and told Mr. Lewis, "I can return it to you or we can shred it. Which would

you like for me to do?" (JA786-87).

Mr. Gigliotti, director of the Durham VAMC, made the final decision to terminate Mr. Lewis on August 29, 2011. (JA222-23). He did this after Mr. Lewis, on August 23, 2011, submitted his new medical evaluation (July – August 2011) to Mr. Gigliotti. The new evaluation was consistent with the earlier one regarding his disabilities. (JA567-71, 593-99). In addition, it explained more precisely how Mr. Lewis' disabilities adversely affected his job performance and what could be done to help Mr. Lewis so that he could be successful at his job. (JA593-99).

When Mr. Gigliotti made his final termination decision, he had not read Mr. Lewis' psychological evaluations (757-59), and he never discussed Mr. Lewis' request for accommodation with Mr. Freeman or Ms. Wright. (JA 733, 740) He relied solely on others' determination that that there was "no causal" relationship between Mr. Lewis' disabilities and his job performance. (JA757-59). He never had anyone with medical or psychological expertise to review Mr. Lewis' medical evaluations because "how would a physician in the private sector know a VA term like, 'HR assistant', that spot on". (JA 761-62) He summarily concluded, "I did not see any medical documentation to show causal effect." (JA757-59).

Although Mr. Gigliotti was "open for reconsideration" (JA 746), he summarily rejected Mr. Lewis' point-by-point rebuttal (JA586-90) of Mr. Freeman's "charges" that purportedly supported Mr. Freeman's proposal for

removal because they were "not communicated properly to his supervisor." (JA 748).

Mr. Lewis has established a prima facie case of retaliation. Whether Defendant's stated justifications for his termination were legitimate or pretextual is, on this record, a jury question.

The cases cited by the district court in support of its summary judgment are distinguishable. In *Staley v. Gruenberg*, 575 Fed. Appx. 153 (4th Cir. 2014)(unpublished), Ms. Staley disregarded FDIC policy, was disrespectful to her supervisors and demonstrated poor judgment. In *Shoaf v. Kimberly Clark Corp.*, 294 F. Supp. 2D 746 (M.D.N.C. 2003), plaintiff, a textile mill employee was fired for violating a confidentiality agreement. The court noted that Title VII affords no protection to such individuals. *Id*. at 755. *Bell v. Shinseki*, 584 Fed. Appx. 42 (4th Cir 1914)(unpublished), also involves the Durham VA as defendant. There plaintiff, employed as a nurse, was injured while working and was unable to return to work.

## CONCLUSION

The record below contains evidence from which a jury could find for Mr. Lewis on each element of his claims for disability discrimination and retaliation. There are genuine issues of material fact in dispute. These claims should be heard and determined by a jury. This Court should reverse the district court's entry of

34

summary judgment for defendant and remand for trial on all issues in both claims.

Respectfully submitted,

 /s/ Mary March W. Exum
Mary March W. Exum
THE EXUM LAW OFFICE
30 Grandview Court
Asheville, NC 28806
*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App.
    32(a)(7)(B) because:

    The word count of this brief is 7, 893.


2.  This brief complies with the typeface requirements of Fed. R. App. P.
    32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    This brief has been prepared in a proportionally spaced typeface using
    MicroSoft Word, Times New Roman, 14 point.


March 23, 2015

                                    /s/ Mary March W. Exum
                                    Mary March W. Exum

36

**CERTIFICATE OF SERVICE**

In accordance with Rule 25 of the Rules of the United States Court of Appeals for the Fourth Circuit, I hereby certify that I have this March 23, 2015, filed the required copies of the foregoing Brief of Appellant in the Office of the Clerk of the Court, via hand delivery and have electronically filed the Brief of Appellant using the Court's CM/ECF system which will send notification of such filing to the following counsel:

Joan Brodish Binkley
Assistant U. S. Attorney
OFFICE OF THE UNITED STATES ATTORNEY
4th Floor
101 South Edgeworth Street
Greensboro, NC 27401
Email: joan.binkley@usdoj.gov


/s/ Mary March W. Exum
Mary March W. Exum